**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PHILIPS MEDICAL SYSTEMS (CLEVELAND), INC., *et al.*, | ) ) |
| Plaintiffs, | ) No. 19 CV 2648 ) ) |
| v. | ) Magistrate Judge Young B. Kim ) |
| JOSE BUAN, *et al.*, | ) ) March 1, 2022 |
| Defendants. | ) ) |

**MEMORANDUM OPINION and ORDER**

Before the court is Defendants Kunshan Yiyuan Medical Technology Co., Ltd.'s ("Yiyuan") and Kunshan GuoLi Electronic Technology Co., Ltd.'s ("GuoLi") (together, "Defendants") motion for reconsideration of this court's orders regarding Plaintiffs' Requests for Production of Documents ("RPD") Nos. 1-60. Specifically, Defendants challenge the court's ruling regarding the impact of Chinese law on their discovery obligations. For the following reasons, the motion is denied:

**Background**

This trade secrets case involves medical x-ray tubes developed and manufactured by Plaintiffs Philips Medical Systems (Cleveland), Inc. and Philips Medical Systems DMC, GmbH. Defendants Jose Buan and Sherman Jen worked for Plaintiffs until December 2019, when they left to take jobs with the newly-formed company GL Leading Technologies, Inc. ("GL Leading"),[1] and thereafter allegedly used the trade secrets they gained from their employment with Plaintiffs

---

[1] GL Leading is also a defendant in this case.

to engineer x-ray tubes for GL Leading's and Defendants' benefit. According to Plaintiffs, GuoLi orchestrated the formation of GL Leading and—through its subsidiary Yiyuan—continues to control GL Leading's operations, including its x-ray tube business.

On October 22, 2021, Defendants sought a protective order from the court to reduce the breadth of Plaintiffs' document requests. (R. 315, Defs.' Mot. for Protective Order.) Defendants argued in that motion, among other things, that "under Chinese law, any documents [they produce] will first have to be reviewed by state authorities to ensure they do not contain state secrets, which will further lengthen the process of producing documents." (Id. at 7.) The court denied the motion but issued a schedule to work through Defendants' objections to Plaintiffs' 213 RPDs in batches of 30 requests at a time. (R. 334.)

In responding to RPD Nos. 1-30, Defendants objected that certain requests were unduly burdensome because they either: (1) asked for the search of employees' personal mobile devices in violation of Chinese privacy law; or (2) required the collection, copying, and storing of GuoLi information that may include state secrets in violation of Chinese state secrets law. (See, e.g., R. 350, Resp. to RPD Nos. 1-30 at 62.) In support of these objections, Defendants attached the "expert opinions" of Professor Xiaoguang Shan regarding Chinese law. (See id. Ex. 2.) The court overruled these objections, stating that Defendants had "failed to demonstrate that Plaintiffs are seeking state secrets or that state secrets are involved in this case,"

and that "neither the court nor Plaintiffs are requiring Defendants to violate any domestic laws in China." (R. 361 at 2 ("the January 5 Order").)

Defendants lodged the same objections based on China's state secrets and privacy laws to RPD Nos. 31-60, (see R. 356, Resp. to RPD Nos. 31-60), and asked the court to order additional briefing regarding the impact of Chinese law on discovery, (R. 357, Defs.' Mot. for Leave to File Reply). The court again overruled the objections and denied the request for additional briefing, finding that "[t]here is no need for further briefing . . . unless and until Defendants are withholding responsive documents because those documents are considered state secrets under Chinese laws or are seeking additional time to produce them because they must submit those documents for government review." (R. 363 ("the January 10 Order").) The court reiterated that it "will not require Defendants to violate any of their domestic laws." (Id.) On January 12, 2022, Defendants filed the present motion asking the court to reconsider portions of these rulings regarding Chinese law. (See R. 367, Defs.' Mot.)

## Analysis

Defendants now contend that the court's January 5 and 10, 2022 orders compel them to violate Chinese law and that January 26 and 31, 2022 production deadlines are "impossible to comply with" in light of approval procedures they must follow in China. (R. 367, Defs.' Mot. at 9.) As such, Defendants ask the court to reconsider its previous orders so that they may have time to comply with Chinese law. (Id.) However, and as explained below, Defendants have failed to satisfy the

3

requirements necessary for granting a motion for reconsideration. The court therefore declines to modify its earlier decisions, except for resetting the deadline by when Defendants must produce responsive documents.

## A.    Standard for Reconsideration

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985). A manifest error occurs "when a district court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Ford v. City of Rockford*, No. 18 CV 50151, 2019 WL 2011104, at *1 (N.D. Ill. May 7, 2019); *accord Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). In the Seventh Circuit, motions for reconsideration are "particularly disfavored when they raise facts or evidence that could have been previously presented." *SFG, Inc. v. Musk*, No. 19 CV 2198, 2021 WL 972887, at *1 (N.D. Ill. Feb. 10, 2021) (citing *Publishers Res.*, 762 F.2d at 561).

Here, Defendants contend that the court committed manifest error by "mistakenly assert[ing] that none of its rulings will require [them] to violate Chinese law." (R. 367, Defs.' Mot. at 3.) Yet in so arguing, Defendants improperly treat their motion for reconsideration as an opportunity to develop new arguments by raising China's Data Security Law for the first time, (id. at 7-8), and submitting new supporting declarations, (id. Exs. 1 ("the Huang Decl."), 5 ("the Ying Decl."), 6 ("the Zhou Decl.")). Defendants make no representations that any of this evidence

4

is newly discovered, and they had ample opportunity to develop these arguments when raising their Chinese law objections in their Motion for Protective Order, (R. 315, Defs.' Mot. for Protective Order), and their responses to RPD Nos. 1-60, (R. 350, Resp. to RPD Nos. 1-30; R. 356, Resp. to RPD Nos. 31-60). But Defendants opted to keep those objections brief and offered only minimal analysis to support their arguments. (See, e.g., R. 350, Resp. to RPD Nos. 1-30 at 62.) While Defendants may now have buyer's remorse after having their objections overruled, a motion for reconsideration is not a proper vehicle for rearguing those objections with greater specificity and detail. *See SFG*, 2021 WL 972887, at *1; Fed. R. Civ. P. 34(b)(2)(B) (objections to document production requests must "state with specificity the grounds for objecting to the request, including the reasons"). To be sure, this court disfavors a trial-and-error approach to litigation.

Accordingly, to prevail on their motion, Defendants must demonstrate that the court has "patently misunderstood" or "made an error not of reasoning but of apprehension" regarding their arguments about China's state secrets and personal privacy laws as those arguments were originally expressed. *Ford*, 2019 WL 2011104, at *1. And as explained below, they cannot.

## B.    Foreign Blocking Laws

Foreign laws that block the production of discoverable material do not automatically excuse a party from its Rule 26 obligations. As the Supreme Court has explained, "[i]t is well settled that [foreign blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe*

*Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). Even "[t]he fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production." *United States v. First Nat'l Bank of Chi.*, 699 F.2d 341, 345 (7th Cir. 1983). However, in recognition of the potential liability a party fulfilling its discovery obligations could face for violating foreign law, courts "should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." *Aerospatiale*, 482 U.S. at 546.

The threshold question, therefore, is "whether [foreign] law actually bars the production at issue." *Republic Techs. (NA), LCC v. BBK Tobacco & Foods*, No. 16 CV 3401, 2017 WL 4287205, at *1 (N.D. Ill. Sept. 27, 2017). This is a mixed question of fact and law. As for fact, the party relying on foreign law to block production bears the burden of "provid[ing] the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Id.* On the other hand, determining the meaning of the foreign statute or court decision is a question of law. *See* Fed. R. Civ. P. 44.1. To make this determination, courts may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Id.* The Seventh Circuit directs the trial courts to "use the best of the available sources," even when this means engaging in their own independent research. *Bodum USA, Inc. v. La Cafetiere, Inc.*,

621 F.3d 624, 628 (7th Cir. 2010). Thus, while expert declarations or testimony "may be essential" to interpreting foreign law that has not been translated into English, "objective, English-language descriptions of [foreign] law" are preferable to the parties' declarations when English-language translations or sources are readily available. *Id.*

If the court determines that the foreign law in question blocks production of the documents at issue, that is not the end of the matter. Instead, the court must conduct an "international comity" review involving "a more particularized analysis of the respective interests of the foreign nation and the requesting nation" to determine whether to order production. *Aerospatiale*, 482 U.S. at 543-44. The Restatement (Third) of Foreign Relations Law of the United States ("Restatement") describes the factors the court must consider in this international comity review:

> [1] the importance to the investigation or litigation of the documents or other information requested; [2] the degree of specificity of the request; [3] whether the information originated in the United States; [4] the availability of alternative means of securing the information; and [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement § 442(1)(c); *see also Aerospatiale*, 482 U.S. at 544 n.28; *Leibovitch v. Islamic Republic of Iran*, 297 F. Supp. 3d 816, 830 (N.D. Ill. 2018).

Courts in other circuits have added two additional factors to this balancing test, and at least one district court in the Seventh Circuit has applied the additional factors: "[6] the hardship of compliance on the party or witness from whom discovery is sought; and [7] the good faith of the party resisting discovery." *Inventus*

*Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 505 (N.D. Ill. 2021) (citing *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 419-20 (S.D.N.Y. 2016) (applying these factors in Second Circuit); *Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*, No. 17 CV 2191, 2019 WL 6134958, at *4 (N.D. Cal. Nov. 19, 2019) (applying hardship factor in Ninth Circuit)). Among these seven factors, factor five— balancing the interests of the United States and the foreign state where the discoverable information is located—"is the most important, as it directly addresses the relations between sovereign nations." *Inventus Power*, 339 F.R.D. at 504 (citation omitted).

## C. Relevant Chinese Law

Defendants identify three Chinese statutes they contend prevent them from complying with Plaintiffs' discovery requests and this court's orders: (1) the Guarding State Secrets Law ("GSSL"); (2) the Personal Information Protection Law ("PIPL"); and (3) the Data Security Law ("DSL").[2] (See generally R. 367, Defs.' Mot.) To explain these laws, Defendants attached "expert opinions" from Professor Xiaoguang Shan regarding Chinese law to their objections to Plaintiffs' RPD Nos. 1-30. (See R. 350, Resp. to RPD Nos. 1-30 Ex. 2; see also R. 367, Defs.' Mot. Ex. 2-4.) But as Plaintiffs correctly point out, English-language translations of these laws are readily available. (See R. 350, Resp. to RPD Nos. 1-30 at 11 n.3.) The court thus

---

[2] Although Defendants improperly bring arguments about the DSL for the first time in their motion for reconsideration, the court includes the law in its analysis for the sake of completeness.

turns directly to the relevant statutory language before considering Professor Shan's expert opinions.[3] *See Bodum*, 621 F.3d at 628.

First, the GSSL provides for the protection of "matters that have a vital bearing on state security and national interests." Law on Guarding State Secrets (promulgated by the Standing Comm. Nat'l People's Cong., Sept. 5, 1988, rev'd April 29, 2010, effective Oct. 1, 2010), art. 2.[4] The law classifies as state secrets "[t]he following matters involving state security and national interests, the disclosure of which may harm the country in politics, the economy, defense, foreign affairs, or other such realms[:] Secret matters in national economic and social development [and] matters concerning science and technology." *Id.* at art. 9. The law requires strict control and protection of state secrets, *id.* at art. 21-23, and seeks to keep state secrets separate from the internet and other public information networks, *id.* at art. 24. The law further makes it unlawful to transfer state secrets information or "transmit items bearing state secrets abroad" without proper authorization. *Id.*

---

[3] Plaintiffs raise concerns regarding the provenance of the Shan Declaration because it is not signed under the penalty of perjury as required by 28 U.S.C. § 1746. (See R. 350, Resp. to RPD Nos. 1-30 at 11.) However, Federal Rule of Civil Procedure 44.1 specifically allows the court to consider "any relevant material or source" regardless of admissibility in determining the meaning of foreign law. That said, concern for the reliability of declarants in interpreting foreign law is a key reason why the Seventh Circuit disfavors dependence on such sources. See *Bodum*, 621 F.3d at 628.

[4] *Translated in* HUMAN RIGHTS IN CHINA, *Annex D – HRIC Translation: Law of the People's Republic of China on Guarding State Secrets (2010)*, *in* SUGGESTED QUESTIONS AND ISSUES TO BE RAISED WITH THE GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA IN ADVANCE OF THE REVIEW OF ITS SECOND REPORT ON THE IMPLEMENTATION OF THE INTERNATIONAL COVENANT ON ECONOMIC, SOCIAL AND CULTURAL RIGHTS (April 1, 2013), https://tbinternet.ohchr.org/Treaties/CESCR/Shared%20Documents/CHN/INT_CESCR_NGO_CHN_14065_E.pdf.

at art. 25. Similarly, "[d]uplicating, recording, or storing state secrets in violation of the law is prohibited," and "secret guarding measures" must be adopted before state secrets can be transmitted through any wired or wireless communication. *Id.* at art. 26.

The GSSL does not speak directly to how a Chinese company that may handle state secrets should respond to discovery requests stemming from litigation in American courts. However, Professor Shan describes the options available to a Chinese company in such circumstances as follows:

> If the U.S. court requires a Chinese company to provide all documents related to a product at issue in the case contained on company servers and company computers, then:
>
> (1) If the product at issue in the case involves state secrets, since it will inevitably constitute a related act prohibited by the [GSSL], the company must apply to the secrecy bureaus of provinces, autonomous regions, direct-administered municipalities for approval. Upon approval, the company can provide the documents to the US court in accordance with the law, or
>
> (2) If the product at issue in the case does not involve any state secrets, but other products and services of the company involve state secrets, the company should be allowed to exclude data related to state secrets contained on the company's servers and company computers before providing evidence to the U.S. court, or select the data involved in the case to avoid the occurrence [of] illegal copying, recording, storage of state secrets, and other prohibited behaviors that are unavoidable due to the indistinguishability of secret-related data from non-secret related data, or
>
> (3) Without excluding or selecting data, the company can also choose to package all data required by the U.S. court as a whole, and apply to the secrecy bureaus of provinces, autonomous regions, and direct-administered municipalities for approval. Upon approval, it can be provided to the U.S. court in accordance with the law.

(R. 367, Defs.' Mot. Ex. 3 at 6.)

Next, the PIPL provides that "[t]he personal information of natural persons receives legal protection" and that "no organization or individual may infringe upon natural persons' personal information rights and interests."  PIPL of the People's Republic of China (promulgated by the Standing Comm. Nat'l People's Cong., Aug. 20, 2021, effective Nov. 1, 2021), art. 2.[5]  This law broadly defines personal information as "all kinds of information, recorded by electronic or other means, related to identified or identifiable persons, not including information after anonymization handling."  *Id.* at art. 4.  The law limits collection of personal information "to the smallest scope for realizing the handling purpose," *id.* at art. 6, and provides that "[n]o organization or individual may illegally collect, use, process, or transmit other persons' personal information, or illegally sell, buy, provide, or disclose other persons' personal information, or engage in personal information handling activities harming national security or the public interest," *id.* at art. 10. The law generally operates based on consent and includes numerous restrictions and safeguards as to the handling of personal information.  *Id.* at art. 13-32.

The PIPL provides some guidance as to how personal information may be shared outside of China.  More specifically, when personal information handlers need to provide personal information outside of China, they may do so if they meet one of four conditions, including "[c]oncluding a contract with the foreign receiving

---

[5]  *Translated in* Rogier Creemers & Graham Webster, *Translation: Personal Information Protection Law of the People's Republic of China – Effective Nov. 1, 2021*, STANFORD UNIV.: DIGICHINA (Sept. 7, 2021), https://digichina.stanford.edu/work/translation-personal-information-protection-law-of-the-peoples-republic-of-china-effective-nov-1-2021/.

side in accordance with a standard contract formulated by the State cyberspace and informatization department, agreeing upon the rights and responsibilities of both sides." *Id.* at art. 38. The personal information handler seeking to share the information must then notify the person whose information is being shared and obtain their consent. *Id.* at art. 39. However, the PIPL states that "[w]ithout the approval of the competent authorities of the People's Republic of China, personal information handlers may not provide personal information stored within the mainland territory of the People's Republic of China to foreign judicial or law enforcement agencies." *Id.* at art. 41. Against this backdrop, Professor Shan explains how discovery of responsive information stored on personal computers or phones should proceed:

> [I]f the U.S. court requires Chinese citizens to cooperate in providing the data involved in their personal computers or personal mobile phones, [the court] should: (1) Allow Chinese citizens to screen for the information involved in the case on their personal computers or personal mobile phones or exclude personal information and private data . . . or (2) execute without screening or exclusion [the notification and review requirements contained in Articles 39 and 41 of the PIPL].

(R. 367, Defs.' Mot. Ex. 3 at 9.)

Finally, the DSL limits the ability of Chinese individuals and organizations to transfer data out of China. The law broadly defines "data" as "any information record in electronic or other form." DSL of the People's Republic of China (promulgated by the Standing Comm. Nat'l People's Cong., June 10, 2021, effective Sept. 1, 2021), art. 3, http://www.npc.gov.cn/englishnpc/c23934/202112/1abd8829788946ecab270e469b13c39c.shtml. As relevant here, the law requires

that "[t]he competent authorities . . . shall handle requests for data made by foreign judicial or law enforcement authorities," and that "[w]ithout the approval of the competent authorities . . . organizations or individuals in [China] shall not provide data stored within [Chinese] territory . . . to any overseas judicial or law enforcement body." *Id.* at art. 36. Professor Shan clarifies that the law requires the approval of "the Supreme People's Court of the People's Republic of China" for data to exit the country. (R. 367, Defs.' Mot. Ex. 3 at 2.) Professor Shan warns, however, that "since these laws have only been implemented for a few months and there is no fixed procedure or precedent to follow, it is quite difficult to obtain the approval of the Supreme People's Court for data exit," and that doing so requires "[a]t least a lot of communication time." (Id. at 10.)

## D. Application

Although Defendants argue that the GSSL, PIPL, and DSL inhibit their ability to comply with this court's discovery orders, they have failed to meet their burden of establishing that "[Chinese] law actually bars the production at issue." *Republic Techs.*, 2017 WL 4287205, at *1. Defendants must provide "information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Id.* However, Defendants have not actually identified any responsive documents for which production may be impacted by Chinese law. Lacking specific and particular information about any such contested documents that may exist, this court cannot conclude that Chinese law bars their production.

Defendants have also failed to demonstrate that the identified Chinese laws would even apply to any responsive documents they possess. Beginning with state secrets, Defendants make clear that they "do not assert that the X-ray tube technology in this case implicates state secrets." (R. 367, Defs.' Mot. at 4.) As a result, it is not clear to the court that the GSSL is even triggered in this instance. Insofar as Defendants fear that documents containing state secrets from GuoLi's other work could be produced inadvertently in a discovery response, their own expert makes clear that Chinese law imposes no barrier to Defendants simply screening such documents out of their discovery productions. (Id. Ex. 3 at 6.) If Defendants have a good faith reason to believe that a responsive document may implicate the GSSL, they may withhold that information and instead produce a corresponding Rule 26(b)(5) privilege log. *See, e.g.*, *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875, 2021 WL 6010575, at *1-2 (D.N.J. Dec. 20, 2021). In light of the delays already experienced litigating issues related to Chinese law, however, the court cautions Defendants against producing a privilege log filled with spurious or poorly articulated state secrets claims.

As for the privacy objection, Defendants also have not demonstrated that any personal information within the meaning of the PIPL is at issue in Plaintiffs' discovery requests. Nor have Defendants identified anything in the law to prohibit a company from directing their employees to look for *business* information stored on personal devices. (R. 380, Hr'g Tr. at 10.) Furthermore, Defendants' own expert makes clear that potential concerns under Chinese privacy law can be ameliorated

14

by allowing employees who search their personal devices to screen out personal information from what they produce to the company. (R. 367, Defs.' Mot. Ex. 3 at 9.) In short, none of the information before the court indicates that the PIPL is in any way implicated by discovery in this case.

Finally, even if Defendants had raised their DSL objection in a timely fashion, they have nevertheless failed to demonstrate that this law applies here. The DSL requires review by the Supreme People's Court before a Chinese individual or organization may provide data in response to requests "made by foreign judicial or law enforcement authorities." DSL at art. 36. Unlike in civil law jurisdictions where the judge takes a leading role in collecting evidence, discovery requests and responses thereto in the American common law system are traded between the parties. *See* Fed. R. Civ. P. 26(b); Geoffrey C. Hazard, Jr., *Discovery and the Role of the Judge in Civil Law Jurisdictions*, 73 NOTRE DAME L. REV. 1017 (1998). While the court oversees the process, it does not make the request and is not involved in the stewardship or use of the exchanged information—in other words, the data is not provided "to the U.S. court." (R. 367, Defs.' Mot. Ex. 3 at 2 ("[When] a Chinese company intends to provide [data] to the U.S. court . . . it should apply to the Supreme People's Court of [China] for approval.").) On its own terms, therefore, the DSL's review and approval requirements do not appear to apply to the American civil discovery process.

Additionally, even if the DSL did apply to civil discovery requested of Chinese litigants in American courts, this court is skeptical that an *Aerospatiale*

international comity analysis would support curtailing discovery on such grounds. As explained, the fifth factor of the relevant seven-factor analysis—balancing the interests of the United States and the foreign government in question—is the most important. *Inventus Power*, 339 F.R.D. at 504. When balancing these competing interests, the Supreme Court has explained:

> The lesson of comity is that neither the discovery order nor the blocking statute can have the same omnipresent effect that it would have in a world of only one sovereign. The blocking statute thus is relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material.

*Aerospatiale*, 482 U.S. at 544 n.29.

Defendants' "understanding" of the DSL would give the Chinese Supreme People's Court broad power to delay or prevent discovery in American courts. Such an interpretation would in essence permit the Chinese judiciary to oversee discovery decisions made by American courts regarding the responsibilities of Chinese litigants. The DSL therefore would not represent a Chinese sovereign interest in the nondisclosure of specific material, but rather an attempt to insert a Chinese court into the American legal process for the potential benefit of Chinese litigants. Not only would such a law infringe upon the sovereignty of the United States, *see* U.S. CONST. art. III; 28 U.S.C. § 1331, but it would also severely disadvantage parties opposing Chinese litigants in American courts. As a result, the United States has a strong interest in not limiting discovery because of the DSL.

As this is a motion for reconsideration, Defendants must demonstrate that the court has "patently misunderstood" or "made an error not of reasoning but of apprehension" regarding their arguments about China's state secrets and personal privacy laws. *Ford*, 2019 WL 2011104, at *1. Because Defendants have failed to show either initially or on reconsideration that the GSSL or PIPL apply to the requested discovery, they have not met this burden.

## Conclusion

For the forgoing reasons, Defendants' motion for partial reconsideration is denied.

ENTER:

Young B. Kim
United States Magistrate Judge